United States District Court
Southern District of Texas

**ENTERED**

March 29, 2017

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JASON WEED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-1658 |
| | § | |
| SIDEWINDER DRILLING, INC. | § | |
| | § | |
| Defendant. | § | |

<u>OPINION AND ORDER DENYING SUMMARY JUDGMENT</u>

Pending before the Court in the above referenced cause, alleging disability discrimination, retaliation, and failure to accommodate in violation of the Americans With Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101, *et seq.*, is Defendant Sidewinder Drilling, Inc.'s ("Sidewinder's") motion for summary judgment (instrument #24).

In his response (#31 at p.11 n.84) to the motion for summary judgment, Plaintiff Jason Weed ("Weed") states that he is nonsuiting his accommodation claim with prejudice, so the Court dismisses it with prejudice.

## Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A dispute of material

-1-

fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the nonmovant bears the burden of proof at trial, the movant must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but does not have to, negate the elements of the nonmovant's case to prevail on summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998). "A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmovant may not rely merely on allegations, denials in a pleading or

unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id.*, *quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

Allegations in a plaintiff's complaint are not evidence. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.,* 14 F.3d 1056, 1060 (5th Cir. 1995)(for the party opposing the motion for summary judgment, "only evidence--not argument, not facts in the complaint--will satisfy' the burden."), *citing Solo Serve Corp. v. Westown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991).  The nonmovant must "go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial." *Giles v. General Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001), *citing Celotex*, 477 U.S. at 324.

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.  The Court may not make credibility determinations. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009), *citing Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007).

### Complaint's Factual Allegations

According to his conclusory complaint, Weed, age 31 when this suit was filed on June 13, 2014, began working for Sidewinder in June 2012, initially in Houston building an oil rig, and from

August 29, 2012 until February 2013 as a Derrick Hand 2[1] on a rig in Williston, North Dakota.  On February 16, 2013, on a bathroom break during his shift, Weed noticed blood in his urine.[2]  Weed notified his supervisor, rig manager  Steven Hayes ("Hayes"), who purportedly walked away without acknowledging Weed's concern.  A safety hand, Joshua Ransonet ("Ransonet"), was called, and he took Weed to the emergency room at Mercy Medical Center in Williston, North Dakota.  Weed and the safety hand were told by the doctor that Weed had a large mass on his kidney and should have a CAT scan.  The doctor told Weed to call a neurologist on Monday.  The safety, who was in communication with Hayes throughout this period, asked the doctor if Weed could return to work.  Weed was given permission by the physician to return to the oil rig, provided that Weed be placed on light duty.

The next day Weed gave Hayes a letter from the doctor stating that Weed was to be restricted to light duty.  Weed told Hayes that the doctor had told him that the mass on Weed's kidney could be cancer.  Weed was placed on light duty on February 17 and 18, 2013, teaching and supervising another Derrick Hand to do his job.  On February 18, 2013 Hayes terminated Weed from working on the rig,

---

[1] Or "Derrickman" in Sidewinder's parlance.

[2] During Weed's deposition, he testified that earlier, in January of 2013, while at work, he experienced abdominal pain, and the same safety hand who later took him to the emergency room on February 16th, took him to see a doctor.  #26, Ex. A, 79:10–80:12.

allegedly for overflowing the trip tank and spilling fifteen barrels of mud that day when he changed the trip out valves. Weed objects that he did not change any trip out valves because it was not his responsibility when he was on light duty. Instead he was assigned to run the TM80.[3] Even though Sidewinder was aware that Weed was not responsible for the mud spill, Weed claims that Sidewinder terminated him because it was known Weed had cancer or was perceived by Sidewinder to have cancer. Weed went home to Delta, Colorado and underwent a CAT scan, which confirmed that the large mass on his kidney was cancer and that it was likely he would have to undergo surgery. Subsequently he had his kidney removed.

Weed alleges that Sidewinder discriminated against him on the basis of his disability or perceived disability with malice or reckless indifference by terminating him from his job. Sidewinder also allegedly retaliated against him. Weed asserts that based on information and belief, similarly situated employees at Sidewinder were treated differently, and that Weed suffered damages as a result of Defendant's discriminatory conduct.

Weed claims that he is a person with a disability as defined by the ADA: one who has the requisite skill, education, experience and other job-related requirements necessary to perform with or without accommodation the essential functions of his job at the time of termination. Weed claims he was disabled or viewed as

---

[3] Hayes explained that a TM80 is "a hydraulic pipe wrench." #26, Ex. B, 48:3-13.

disabled by Sidewinder.  While employed by Sidewinder, Weed was a "qualified individual with a disability," was a qualified individual with a record of disability, and/or was regarded by Defendant as a person with a disability under the ADA.  Weed claims he was terminated as a direct result of his disability or perceived disability, a physical impairment that limited a major life activity under the statute, and/or perceived disability.

**Sidewinder's Motion for Summary Judgment and Brief (#24 & 25)**

Sidewinder argues that Weed was a "subpar employee" whose incompetence resulted in "two careless and nearly identical mistakes that caused spills of oil-based mud." #25 at p. 1.  It claimed that such a spill could harm the health and safety of employees, risk damage to the rig equipment, and cause environmental contamination.  The first spill occurred in November 2012, and Weed was given oral counseling by then rig manager Billy Pitts ("Pitts").  Nevertheless Weed's work allegedly continued to be substandard, and Weed caused a second spill in February 2013. After that spill Sidewinder removed Weed from the rig, the human resources department investigated both spills, and Sidewinder terminated Weed.

As for Weed's alleged disability, Sidewinder states that Weed's doctor found a cyst on Weed's kidney two days before Weed caused the second spill.  Only after Weed was terminated did Weed's doctors determine that the cyst was cancerous.  Nobody, including Weed and his doctors, knew that Weed had cancer at the time he was

discharged, insists Sidewinder.

### Applicable Law:  the ADA

Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), prohibits discrimination against an employee on the basis of physical or mental disability and requires an employer to make reasonable accommodations necessary to allow an employee with a disability to perform the essential functions of his job unless the accommodation would impose an undue hardship on the employer.  When an employee's disability is not open or apparent to the employer, the plaintiff or his health provider bears the burden to identify the disability and its resulting limitations. *Taylor v. Principal Fin. Group*, 93 F.3d 155, 165 (5th Cir. 1996).

Section 12112(a) of the ADA provides that no covered entity shall "discriminate" against a qualified individual with a disability because of the disability of such an individual in regard to, *inter alia*, "the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment."  In addition, § 12112(b)(5) states that the term, "discriminate," includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operations of the business of such covered entity."  A "qualified individual with a disability" is defined as "an individual with a disability  who, with or without reasonable

accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A disability is "(A) a physical or mental impairment that substantially limits one or more of the major activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."[4] *See Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999) and *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184 (2002), both of which were subsequently overturned by the ADA Amendments Act of 2008, §2(b)(5), 122 Stat. 3553, 3558 ("ADAAA"). *Sutton*, holding that an employee is not disabled if his impairment is corrected by a mitigating measure to the point where it does not substantially limit a major life activity (e.g., by insulin given to a diabetic), required a court to take into account the ameliorative effects of

---

[4] Courts look to two possible authorities for interpreting the terms of § 12101:  the regulations interpreting the Rehabilitation Act of 1973, 87 Stat. 361, as amended, 29 U.S.C. § 706(8)(B)(1988), and the EEOC regulations construing the ADA. *EEOC v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 614 n.4 (5th Cir. 2009), *citing Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 193 (2002).  The Rehabilitation Act, which prohibits discrimination based on disability by recipients of federal funds, is a precursor to the ADA on which Congress relied in drafting the ADA and about which Congress specified, "Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under Title V of The Rehabilitation Act of 1973 (29 U.S.C. §§ 790 *et seq.*) or the regulations issued by Federal agencies pursuant to such title." *Chevron Phillips*, 570 F.3d at 614 n.5.

mitigating measures in determining whether there was a disability,[5] while *Toyota* narrowly construed and strictly interpreted the term "disability."[6]

To state a claim under subsection A, a plaintiff must allege that she has a physical or mental impairment.  § 12102(2)(A); 29 C.F.R. § 1630.2(g).  A "physical impairment" is "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems:  neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic, skin; and endocrine."  29 C.F.R. § 1630.2(h)(1).

Simply having an impairment is insufficient to make one disabled under the statute; a plaintiff must also show that the impairment substantially limits a major life activity.  *Chevron Phillips,* 570 F.3d at 614, *citing Toyota Motor*, 534 U.S. 184, 195

_____

[5] In *Sutton*, 527 U.S. at 482, the Supreme Court opined, "[I]f a person taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures--both positive and negative--must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the [ADA]."

[6] In *Toyota* the Supreme Court held that "major life activities" include "activities that are of central importance to daily life," and they are "substantially limited" when the impairment "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  The limitation had to "be permanent or long-term." 534 U.S. at 198, citing 29 C.F.R. § 1630.2(j).  Moreover "substantially limits" must be construed "strictly to create a demanding standard for qualifying as disabled."  *Id.* at 197.

(2002).  The implementing regulations in § 1630.2(I) provides a
non-exhaustive list of major life activities, which include "caring
for oneself, performing manual tasks, walking, seeing, hearing,
speaking, breathing, learning, and walking."  29 C.F.R. §
1630.2(I); *id*.  Moreover, "to be substantially limited means to be
unable to perform a major life activity that the average person in
the general population can perform or to be significantly
restricted in the ability to perform it."  *Id.*, *citing* 29 C.F.R. §
1630.2(j).  In deciding whether a person is "substantially limited
in a major life activity, the Equal Employment Opportunity
Commission ("EEOC") advised that courts should consider: '(I) the
nature and severity of the impairment, (ii) the duration or
expected duration of the impairment; and (iii) the permanent or
long term impact, or the expected permanent or long term impact of
or resulting from the impairment.'"  *Id.* at 614-15, *citing* 29
C.F.R. § 1630.2(j).  "[W]hether an individual is disabled under the
ADA . . . remains an individualized inquiry."  *Id.* at 620.

The ADA was amended by the Americans with Disabilities Act
Amendments Act of 2008 ("ADAAA"), which by its express language
became effective on January 1, 2009, while the final regulations
issued by the EEOC became effective on May 25, 2011.  76 Fed. Reg.,
16978, 16999 (2011).  "The ADAAA is principally aimed at reversing
Supreme Court precedent perceived as improperly narrowing the scope
of protection originally intended by drafters of the ADA."  Louis
P. DiLorenzo, *The Intersection of the FMLA and ADA--As Modified by*

*NDAA, ADAAA and GINA*, 860 PLI/Lit 47, 83-84 (June 23, 2011); 29 C.F.R. § 1630.1(c)(4)("reinstating a broad scope of protection under the ADA"; "the definition of 'disability' shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA").  The EEOC emphasized that "the primary object of attention in cases . . . should be whether the covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." 29 C.F.R. § 1630.1(c)(4).

The ADAAA directs that "substantially limits" should not be as strictly construed as some courts have required in the past and should not require "extensive analysis."  ADA Amendments Act of 2008, §2(b)(5), 122 Stat. 3553, 3558.  The ADAAA has added "major bodily functions" (e.g., the immune system, ***normal cell growth,*** [emphasis added by the Court relating to Weed's purported disability] digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions) to the ADA's list of major life activities, including caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, standing, sitting, reaching, lifting, bending, reading, concentrating, thinking, communicating, and working, while defining "physical or mental impairment" as any physiological disorder or condition, cosmetic disfigurement or anatomical loss affecting one or more body systems, as well as mental or psychological disorder. ADA Amendments Act of 2008, Pub. L. No. 110-325, §§ 4, § 3(2)(A)

and (B), 122 Stat. 3553, 3555.

Moreover, while retaining the basic definition of disability under the ADA ("a physical or mental impairment that substantially limits one or more major life activities"), "disability" now includes an impairment that is episodic or in remission if it would substantially limit a major life activity when active; examples include epilepsy, hypertension, asthma, diabetes, major depression, bipolar disorder, schizophrenia, and **cancer**[7] (emphasis by this Court). ADA Amendments Act of 2008, §§ 4, § 3(4)(D), 122 Stat. 3553, 3555; 29 C.F.R. § 1630(j)(5). An impairment lasting less than six months can be substantially limiting. 29 C.F.R. § 1630.2(j)(1)(ix). An impairment that is in remission but may return in a substantially limiting form is a disability under the ADAAA. 29 C.F.R. § 1630.2(j)(1)(vii). The ADAAA also amended

---

[7] Cancer is listed as an impairment because it "substantially limits [the major life activity] of normal cell growth." 29 C.F.R. § 1630.2(j)(3)(iii). *Norton v. Assisted Living Concepts*, 786 F. Supp. 2d 1173, 1186 (N.D. Tex. 2011) (citing as examples in the legislative history of the ADAAA where Congress named cancer is the kind of impairment that would qualify as a disability: 2011 WL 1060575, at 17007, 17011, and 17012). Thus what under the ADA the "regarded as having such an impairment" prong of the disability definition "was interpreted to mean that an employer had to regard or perceive an individual as substantially limited in a major life activity," under the new provision in the ADAAA an individual satisfies the requirement if he "establishes that the employer discriminated against him because of an actual or perceived impairment, 'whether or not the impairment limits or is perceived to limit a major activity.'" *Schmitz v. Louisiana*, Civ. A. No. 07-891-SCR, 2009 WL 210497, at *2 (M.D. La. Jan. 27, 2009). In other words, under the new provision "the defendant's perception of plaintiff's impairment is not relevant to whether the plaintiff is disabled under the 'regarded as' prong. *Id.* at *3.

*Toyota*'s definition of "major life activity" as "activities that are of central importance to most people's daily lives," instead indicating that the word "major" must "not be interpreted strictly to create a demanding standard for disability." 29 C.F.R. § 1630.2(i)(2). Under the ADAAA, tasks involving major life activity of manual tasks, such as fine motor coordination, grasping, or pressuring, "need not constitute activities of central importance to most people's lives." Appendix to Part 1630, *Interpretive Guidance on Title I of the Americans With Disabilities Act* § 1630.2(I); 76 Fed. Reg. at 17008. To be "substantially limiting" an impairment does not have to prevent or significantly restrict a person from performing a major life activity. *Id.*

Mitigating measures (such as medications, medical devices and assistive technology) are ignored when assessing whether an impairment substantially limits a person's major life activities. ADA Amendments Act of 2008, § 4, § 3(4)(E)(1), 122 Stat. 3553, 3556. Moreover, the court may consider the negative effects of a mitigating measure, e.g., effects of medication, in determining whether the individual is substantially limited in a major life activity.

Furthermore, individuals who are "regarded as disabled," but who do not actually have a disability, only need to show that they were subjected to an action prohibited by the statute, and no longer that the disability substantially limited them in a major life activity. Employers need not provide reasonable

-14-

accommodations to those employees only "regarded as" having a disability.  ADA Amendments Act of 2008, Sec. 6 § 501 (l)(h), 122 Stat. 3553, 3558.

When only indirect or circumstantial evidence is available, a plaintiff alleging a violation of the ADA must meet the burden-shifting framework of *McDonnell Douglas*.[8]  *Chevron Phillips*, 570 F.3d at 615, citing *McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 279 (5th Cir. 2000).

_____

[8] *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973)(first, plaintiff in a Title VII case creates a presumption of intentional discrimination by establishing a prima facie case; second, if he succeeds the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its challenged employment decision; third, if the employer meets this burden, the plaintiff must show (a) that the employer's reason is not true, but a pretext for discrimination, or (b) the defendant's reason, though true, is only one reason for its conduct and that another factor is the plaintiff's protected characteristic (mixed motive alternative)).  The last element, known as the mixed motive rule, was developed in Title VII cases, and the Fifth Circuit has recognized that "the ADA is part of the same broad remedial framework as . . . Title VII, and that all the anti-discrimination acts have been subjected to similar analysis" as to burden of proof.  *Miller v. Public Storage Mgmt., Inc.*, 121 F.3d 215, 218 (5th Cir. 1997).  Nevertheless the question arose after the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 175 (2009)(holding that the mixed motives theory is unavailable under the Age Discrimination in Employment Act of 1967, 29 U.S. § 621, *et. seq.*).

The Fifth Circuit has questioned whether the Supreme Court's recent decision in *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343, 2349 (2009) makes the mixed motive framework unavailable to plaintiffs alleging discrimination outside of Title VII.  *See, e.g., Wilson v. Noble Drilling Services, Inc.*, No. 10-20129, 405 Fed. Appx. 909, 912 (5th Cir. Dec. 23, 2010)(based on distinct statutory texts, holding that motivating factor test does not apply to FMLA, while Title VII explicitly authorizes such an approach in Title VII).

In a key decision for the instant disability discrimination action, *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 695-97 (5th Cir. 2014), the Fifth Circuit clarified the elements of a prima facie case required to show the nexus between an employee's disability or perceived disability and his termination.  The panel observed that in the past it consistently required a plaintiff to prove that (1) he has a disability (or is perceived as having a disability) and (2) he is qualified for the job he held.  *Id.* at 695, *citing Zenor v. El Paso Healthcare System, Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999).  From the *Zenor* test the case law splits into three separate lines concerning the causal nexus:  (1) one line requires the employee to prove that he was subject to an adverse employment decision on account of his disability."  *LHC Group,* 773 F.3d at 695, *citing id*.  A second line of case law requires the plaintiff to prove that he was "subject to an adverse employment action . . . and . . . he . . . was replaced by a nondisabled person or was treated less favorably than non-disabled employees."  *Id., citing Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 (5th Cir. 1997).  The third line requires the plaintiff to prove that he was subject to an adverse employment action because of his disability and he was replaced by or treated less favorably than non-disabled employees. *Id., citing E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009), *citing McGinness v. Alamo Comm. College*

*Dist.*, 207 F.3d 276, 279 (5th Cir. 2000).[9]

The Fifth Circuit panel in *LHC Group* went on to point out, "'It is a well-settled Fifth Circuit rule of orderliness  that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by statutory amendment, or the Supreme Court, or our *en banc* court.'"  *Id., quoting Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008).  The *LHC Group* panel then held that the earliest test articulated in *Zenor* controls (requiring "the employee to show that he was subject to an adverse employment decision on account of his disability") because it was "first used in the disability-discrimination context in *Chiari v. City of League City,* 920 F.2d 311, 315 (5th Cir. 1991)(interpreting Rehabilitation Act of 1973, 29 U.S.C.A. § 794(a), the ADA's predecessor).  In contrast, the second formulation (that he was replaced by or treated less favorably than non-disabled employees) was first used in the disability-discrimination context in *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 396 (5th Cir. 1995), four years after *Chiari.* Furthermore, this second line of the *Daigle* test "was likely imported from *McDonnell Douglas*--a case focused on discriminatory hiring, not termination," and required as part of the prima facie case that after the plaintiff is rejected for the job, he must show

_____

[9] The panel rejected the third line because it requires plaintiffs to prove causation twice, as well as the reason it rejected the second, discussed *supra* in the text.  733 F.3d at 696.

-17-

that "the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. 792, 802 (1973).  The *LHC Group* panel explained, "In the *McDonnell Douglas* context, where the employer and the applicant have only a handful of interactions before the allegedly discriminatory hiring decision is made, the subsequent history of the open position is highly relevant to a finding of discrimination.  By contrast, where termination is at issue, plaintiffs may draw on their employment history to prove a nexus between their protected trait and their termination." *LHC*, 773 F.3d at 696.  The panel noted that its decision was in accord with those of its sister Circuits, "which have overwhelmingly required plaintiffs to prove their termination was because of their disability rather than provide evidence of disfavored treatment or replacement." *Id.*  The Fifth Circuit has reiterated the holding of *LHC Group* a number of times subsequently. See, e.g., *Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476, 479-80 (5th Cir. 2016); *Clark v. Boyd Tunica, Inc.*, ___ Fed. Appx. __, No. 16-60167, 2016 WL 7187380 (5th Cir. Dec. 9, 2016); *Rodriguez v. Eli Lilly and Co.*, 820 F.3d 759, 765 (5th Cir. 2016); *Benson v. Tyson Foods, Inc.*, Civ. A. No. 4:14-cv-00121, 2016 WL 3617803, at *6 (E.D. Tex., July 6, 2016).  In sum, the prima facie case approved by the panel for a disability-discrimination-in-termination claim under the ADA arises from the *Zencor* line of cases, which requires a plaintiff to allege and show (1) he has a disability; (2) he was qualified for the job; and (3) that he was

subject to an adverse employment on account of his disability.  773 F.3d at 697.  *See Zenor*, 176 F.3d at 853.  Thus there is no necessity for comparators under this test.

If the plaintiff succeeds, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action.  *Id.* at 701-02.  Once the employer has done so, the presumption of discrimination dissolves, and "the issue becomes discrimination *vel non*."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000).  The plaintiff must show either that the employer's reason is not true, i.e., is pretextual, or that the defendant's reason while true, is only one reason for its conduct and another motivating factor is the plaintiff's protected characteristic, which under the ADA is his disability or perceived disability.  *LHC* Group, 773 F.3d at 702; *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

As noted, however, there is disagreement and uncertainty whether or not mixed motives are viable under the ADA in light of the Supreme Court's decision in *Gross*.  *Clark*, 2016 WL 7187380, at *3 n.4 (citing *LHC Group*, 773 F.3d at 702 (applying mixed-motives alternative without addressing *Gross)*, with, e.g., *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 318-21 (6th Cir. 2012)(en banc)(concluding that mixed motives claims are not viable under the ADA in light of *Gross*).  The trier of fact can consider any evidence presented in the prima facie case and any other evidence the plaintiff presents to show that the employer's

articulated reason for the adverse employment action was pretextual. *Id.* "Pretext is established 'either through evidence of disparate treatment or by showing that the employer's proffered expectation is false or 'unworthy of credence.''" *Delaval*, 824 F.3d at 480, *citing Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).[10] "At summary judgment, '[e]vidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of the defendant's true motive.'" *LHC Group*, 773 F.3d at 702.

A claim of unlawful retaliation under the ADA, as under Title VII, requires a plaintiff to make a prima facie case by showing that (1) he engaged in an activity protected by the ADA, (2) he suffered an adverse employment action, and (3) there is a causal connection between the protected act and the adverse action. *Seaman v. CSPH*, 179 F.3d 297, 301 (5th Cir. 1999), *cited for that proposition in Tabatchnik v. Continental Airlines*, 262 Fed. Appx.

---

[10] Sidewinder cites two cases that hold that the comparator element is still required for a prima facie case under the ADA: *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 230 (5th Cir. 2015), and *Flanner v. Chase Inv. Servs. Corp.*, 600 Fed. Appx. 914, 916, 922 (5th Cir. 2015). The Court finds that the language in *LHC Group* is quite clear about the change in the law, and the two cases cited by Sidewinder were issued later and fail to follow the "Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by statutory amendment, or the Supreme Court, or our *en banc* court.'" *Jacobs*, 548 F.3d at 378.

674, 676 (5th Cir. Jan. 30, 2008).  If the plaintiff succeeds, the employer must present a legitimate, non-discriminatory reason for the retaliatory adverse employment action.  *Seaman*, 179 F.3d at 301.  If the employer succeeds, the plaintiff must present sufficient evidence showing that the employer's proffered reason is a pretext for discrimination and that but for the protected activity, the adverse action would not have occurred.  *Id.*

     With regard to retaliation claims, the Fifth Circuit has ruled that under the ADA as amended by the ADAAA, an individual who is "regarded as disabled," but who does not actually have a disability, only has to show that the disability substantially limited him in an action prohibited by the statute, and no longer that the disability substantially limited him in a major life activity.  *Garner v. Chevron Phillips Chemical Co., LP*, 834 F. Supp. 2d 528, 539 (S.D. Tex. 2011).  The employer does not have to provide reasonable accommodations to employees only "regarded as" having a disability."  "A claim of unlawful retaliation under the ADA, as under Title VII, requires a plaintiff to make a *prima facie* case by showing that (1) he or she engaged in an activity protected by th ADA, (2) he or she suffered an adverse employment action, and (3) there is a causal connection between the protected act and the adverse action."  *Id.* at 540.  If he does so, the employer must provide a legitimate, nondiscriminatory reason for the retaliatory adverse employment action; if he does, "the plaintiff must present sufficient evidence showing that the employer's proffered reason is

a pretext for discrimination and the plaintiff must show that but for the protected activity, the adverse action would not have occurred." *Id.* "To prevail on a claim of retaliation, "'[c]lose timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation.'" *Id.* at 541, *citing Dooley v. Parks and Recreation for Parish of East Baton* Rouge, No. 10-31254, 2011 WL 2938080, *3 (5th Cir. July 22, 2011), *citing Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997), *citing Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993). "'[T]he mere fact that some adverse action is taken *after* an employee engages in some protected activity will not *always* be enough for a *prima facie* case.'" *Id.*, *citing  Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 655 (5th Cir. 2004)(*quoting Swanson*, 110 F.3d at 1188 n.3).   "However, once the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive." *Id., citing Swanson*, 110 F.3d at 1188 n.3, and *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 656 (5th Cir. 2004)("Without more than timing allegations, and based on Alltel's legitimate, nondiscriminatory reason in this case, summary judgment in favor of Alltel was proper.").   "'[T]he mere fact that some adverse action is taken *after* an employee engages in some protected activity will not *always* be enough for a *prima facie* case.'"   *Id., citing*

*Roberson*, 373 F.3d at 655. "'[O]nce the employer offers a legitimate nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive.'" *Id., citing Roberson*, 373 F.3d at 656. For a retaliation claim under the ADA, in contrast to one under Title VII, the plaintiff does not have to show that he suffers from an actual disability, but only that he has "a reasonable good faith belief that the statue has been violated. . . . Where he has a good faith belief . . . that he is perceived as disabled, making a request for a reasonable accommodation under the ADA may constitute engaging in a protected activity." *Garner*, 834 F. Supp. 2d at 541, *citing Tabatchnik*, 262 Fed. Appx. at 676 & n.1 (failure to prove a disability does not preclude the plaintiff from pursuing a retaliation claim), and 423 U.S.C. § 12112(b)(5)(A).[11]

Weed contends that Sidewinder denied Weed's request for a reasonable accommodation at his job and failed to engage in the interactive process in good faith. Subsequent to Weed's complaints

---

[11] The statute suggests as reasonable accommodations "(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Feist v. Louisiana Dept. of Justice, Office of the Attorney General*, 730 F.3d 450, 453 (5th Cir. 2013), *quoting* 42 U.S.C. § 12111(9).

of being treated differently, he endured retaliation and adverse employment actions, including termination.  In turn, Weed asserts that the discrimination and retaliation caused Weed to suffer severe emotional distress, lost wages, lost raises, lost seniority and retirement benefits, mental anguish, loss of enjoyment of life, and other benefits.

**Sidewinder's Motion for Summary Judgment (#24, 25, 26)**

First, Sidewinder argues that Weed cannot establish a prima facie case of ADA discrimination because (1) he cannot show he was terminated because of his disability; (2) Weed cannot demonstrate that he was replaced by a non-disabled employee, nor that he was treated less favorably than a non-disabled employee[12]; and (3) Sidewinder had a legitimate, non-discriminatory reason to discharge Weed, and Weed has no evidence that this reason is pretext.

Second, Weed fails to establish a prima facie case of ADA retaliation because (1) Weed did not engage in a protected activity because he did not have a good faith belief that he was disabled or was seen as disabled when he asked for an accommodation; and (2) Sidewinder had a legitimate, non-discriminatory reason to terminate Weed, and Weed has no evidence that the reason was pretext.

Sidewinder describes Weed's duties as a derrickman:  working

---

[12] As noted, the Fifth Circuit has rejected the element of being replaced by or treated less favorably than a non-disabled person for making a prima facie case of disability discrimination. *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d at 695-97, *citing Zenor*, 176 F.3d at 853.

on the moneky board, pulling drilling pipe, inserting drilling pipe into the elevators, attaching pipe to the traveling block during tripping activities and being responsible for the drilling mud and the tanks, including overseeing mud pumps, shale shakers, gas buster, and trip tanks.  #26, Ex. C, Affidavit at ¶3 of Sidewinder People Development Manager, Wendy Mitchell; Ex. B at 13:22-14:3, Dep. of Jeffrey Steven Hayes ("Hayes"), rig manager on Rig 103 in North Dakota and Weed's supervisor in February 2013.  Sidewinder maintains that Weed, in his capacity as a derrickman, was responsible for maintaining the oil-based drilling mud, keeping it from overheating, preventing the well from blowing out, and preventing fluid loss that might threaten safety.  #26, Ex. B, Hayes Dep., 33:12-34:12.  During drilling operations, a flow line connects the mud from the drill to the trip tank, which has a limited capacity.  *Id.* at 23:17-24; 24:16-18.  To facilitate drilling, the driller at times must pump a "slug," a process called "tripping out."  *Id.*. 23:10-12.

Weed explained during his deposition that on a trip out, the derrickman made certain that all of the valves were closed so nothing was running.  #26, Ex. A, Weed Dep., 72:19-73:1;108:11-13.  One of the valves was the flow line for the mud to return to the shale shakers.  #26, Ex. B, Hayes Dep., 18:24-19-4; Ex. A, Weed Dep., 95:14-16.  The shakers clean and store the oil-based mud for re-use.  #26, Ex. B, Hayes Dep., 24:4-12.  If the mud is not diverted to the shakers, the volume of it will be more than the

-25-

capacity of the trip tank and it will overflow or spill. *Id.* at 24:13-20. To be certain that the valves are in the proper position, if the foot-long handle is perpendicular to the pipe, the valve is closed; if it is aligned with the pipe, it is open. *Id.*, Ex. A, Weed Dep., 130:16-18, 12-15.

According to Sidewinder, on Weed's first job in North Dakota in November 2012, he caused a spill when he failed to check the alignment when the valves were not correctly aligned, so the oil-based mud overflowed the trip tank. #26, Ex. B, Hayes Dep., 14:7-20; Ex. A, Weed Dep., 125:7-126:7, 123:20-124:24, 125:7-126:7. Conrad Peterson, a company representative of, and the man who gave drilling orders for, StatOil,[13] the company with which Sidewinder had contracted to drill oil at this site, was present and reported the overflow to Sidewinder. #26, Ex. C, Mitchell Affid., ¶ 8; Ex. A, Weed Dep., 124:7-125:6; Ex. B, Hayes Dep., 10:13-11:5. Billy Pitts, the Sidewinder rig manager on duty, orally counseled Weed about his carelessness. #26, Ex. A, Weed Dep. 125:14-20. Sidewinder contends that Weed conceded that he failed to check the valves and therefore the spill was his fault. #26, Ex. A, Weed Dep., 126:4-7 ("Technically, it's my fault.").[14]

---

[13] #26, Ex. B, Hayes Dep., 10:20-11:2.

[14] Sidewinder takes this sentence out of context, thereby misrepresenting its content. The deposition testimony is as follows (Ex. A 125:7-127:10):

Q. So let me make sure that I understand this. You came on and you talked to the derrickhand who was going

off shift.  Right?
A.  Yes, sir.
Q.  And the derrickhand represented to you that
everything was good to go?
A.  Yes, sir.
Q.  And you took him at face value?
A.  I took him at face value and that's when Billy
Pitts counseled me at that point in time-
Q.  (By Mr. LaMendola)  Billy Pitts counseled you about
taking other employees at face value?
A.  Yep.
Q.  As a derrickman, just because the derrick man
that's going off tells you something doesn't mean that
you can necessarily rely on that.  Right?
A.  Yes, sir.
Q.  Does it relieve you of your independent
responsibilities as a derrickman to make sure that the
operations are going to correctly go forward?
A.  No, sir.
Q.  So that wasn't your fault, the fact that you didn't
double check what had previously been done, that's not
your fault?
A.  Technically, it's my fault.
Q.  Okay.  And Conrad Peterson was present and saw that
you were the derrickman-is it derrickman?
A.  Derrickhand.
Q.  Conrad Peterson was present when this first
incident occurred and was aware that you were the
derrickhand that was on shift when it occurred?
A.  Yes, sir.
Q.  Did you talk with Conrad about what happened?
A. No.
Q.  Did you tell Billy Pitts, the rig manager, that it
wasn't your fault that it was actually the other
derrickhand's fault?
A.  Yes.
Q.  Who was the other derrickhand?
A.  I don't recall his name.
Q.  So both of these incidents that you were involved
in, not your fault?  Fair to say?
A.  One of them I know for sure is not my fault.
Q.  Which one?
A.  Both of them, technically, is not my fault but one
of them I can take the blame for because I didn't go
down and check like Billy Pitts told me.  The first one
was not my fault.
Q.  The first one's not--okay.  So the second one is

According to Sidewinder, three months later, on February 18, 2013, rig manager and Weed's supervisor, Steven Hayes, was on duty and reported that Weed told the driller that he had the valves properly aligned for the oil-based mud to go to the shakers.  The valves were not properly aligned, with the result that a volume of the mud overflowed the trip tank and caused a spill.  #26, Ex. B, Hayes Dep., 18:21-19:12.  Conrad Peterson of Statoil was also present at this spill and reported it to Steven Hayes, who then investigated.  Ex. A, Weed Dep. 110:16-11:6; Ex. B, Hayes Dep., 27:10-18, 24:25-25:4.  Hayes decided that Weed was responsible for the spill because the spill was in his work area and because Weed was there when Hayes went down to investigate.  #26, Ex. B, Hayes Dep., 25:7-13.  Hayes asked Weed what happened, and, according to Hayes, Weed admitted, "I didn't have it lined up right," although

---

        your fault?
        A.  No.  The one with changing the valves is not my
        fault.  So that would have been the incident on the
        eighteenth.

The questioning continues as Weed was asked to read his answer to
Interrogatory No. 4:

        A.  Plaintiff was terminated simply for a mud spill due
        to a changed trip valve.  Plaintiff did not change the
        valve and was not responsible for this either, due to
        his light duty.  Plaintiff was assigned to run the TM80
        and was never assigned to switch the trip out valve.
        Q.  Here's what you said under oath is that you were
        terminated for the mud spill due to a changed trip
        valve, but you weren't responsible for this because you
        were on light duty and that you were assigned to run
        the TM80.  You weren't assigned to watch the trip-out
        valves.
        A.  Yes sir.  That's what it says.

Hayes conceded that Weed did not admit to causing the spill.  #26, Ex. B, Hayes Dep., 25:23-26:8, 16:12-15.  According to Hayes, however, the misalignment caused the spill, but Hayes also stated that he could not remember if there was anyone there with him when he talked to Weed.  *Id.,* 26:12-18.  Hayes testified that he then brought up the prior spill, and claims that Weed did not say anything.  *Id.*, 26:19-24.  Later that day according to an email from Wendy Mitchell, Statoil called Hayes and told Hayes that Weed would no longer be allowed to work on a rig currently under contract to Statoil, although Hayes could not remember it. *Id.*, Ex. B, Hayes Dep., 28:20-29:24. Hayes then "kicked [Weed] off the rig." Ex. B, 31:7-24.  Furthermore Hayes recommended that Sidewinder discharge Weed.  *Id.* at 32: 2-4; #26, Ex. C, Mitchell Affid. at ¶4. Hayes again discussed the first mud spill, and Weed did not deny he was responsible.[15]  Ex. A, Weed Dep., Ex. B, Hayes Dep. 32:13-19. Sidewinder paid to fly Weed home to Colorado the next day.  Ex. A, Weed Dep., 132:14-20.

According to Sidewinder, Weed was terminated not only because he caused two spills of oil-based mud in four months, but also because he was an incompetent employee at a time when derrick hands were easy to replace.  #26, Ex. B, Hayes Dep., 39:2-16, 36:8-10, 37:1-6.  Hayes stated that Weed "just didn't know what he was doing

---

[15] The Court observes that "Weed did not dispute" and "Weed did not deny he was responsible" are not the same as "Weed admitted."

up there." *Id.*, 13:15-17.   Weed allegedly left equipment
unrepaired for his relief to fix and had difficulty maintaining his
drilling mud and working the monkey board.  #26, Ex. B, Hayes Dep.,
33:12-21, 34:6-12, 13:5-14.   Weed had frequently been counseled by
Hayes about the same problems.   *Id.*, Hayes Dep., 66:20-67:11,
67:20-68:1.

Since Weed had been employed by Sidewinder for less than a
year, he had not received an annual appraisal before he was removed
from Rig 103.    After reporting blood in his urine to his
supervisor, Weed, accompanied by safety hand Joshua Ransonet, went
to the emergency room in North Dakota.    After running tests,
including a CT scan, on Weed, the doctor informed him that he had
a cyst on his kidney.   He did not tell Weed that he likely had
cancer, but rather said "that there's a potential chance of it
being cancer."   Ex. B, Hayes Dep., 37:12-38:1; Ex. A, Weed Dep.,
81:4-14.   While Sidewinder understood that a cyst on a kidney was
common and that a followup to rule out cancer was just a
precaution, Sidewinder insists that neither Sidewinder nor Weed
knew he had cancer or perceived him as being disabled.   Ex. C-3,
Ransonet Emails at SIDEWINDER 19,20[16]; Ex. B, Hayes Dep. 38:7-39:1,

---

[16]Josh Ransonet's first email, sent Saturday, February 16,
2013 at 7:43 p.m., in response to a question from "Canebrake 103
RM," Weed's rig assignment (#26, Ex. C-1),"Do you think he [Weed]
needs to go home and get checked out by his own dr[.]"  Hayes
admitted during his deposition that he was the author of the
initial Canebrake email inquiring about Weed's health the day he
went to the emergency room because of blood in his urine.
Ransonet wrote,

Ex. C, Mitchell Affid. at ¶13.   Sidewinder maintains that the
ultimate decision maker, Wendy Mitchell, did not know that the
doctor had told Weed he might have cancer.  Ex. C, Mitchell Affid.,
¶14.  Weed's doctors released him that day to go back to work, full
duty, but "restricted to ground work only."  Ex. B, Hayes Dep.

---

> The doctor just came back from cat scan 2.  He said it
> was a large cyst.  The cyst still has a possibility of
> being cancerous so they want to run further tests a
> week from Monday over in Minot.  He was cleared to go
> back to work.  He is to stay at ground level but can
> work normal labor.  Doctor said he can't hurt anything.
> Just don't want him on the monkey board.

Even later that same night at 11:06 p.m., an hour suggesting
heightened concern about Weed, Ransonet sent another email:

> Made it home safe tonight after dropping off Jason.
> Final diagnosis was that he has a cyst on his left
> kidney.  As the cyst grows it pulls at the tissues
> causing bleeding.  Hence, the blood in the urine.  He
> says this is common and most people have them and never
> know.  He gave him some antibiotics and told him to
> call the hospital in Minot on Monday,  A urologist
> would like to see him Monday after next.  Next step in
> MRI just to be sure cyst isn't cancerous.  Just a
> precaution.  Dr says Jason is fine to go to work,
> normal working conditions, however, not at a height
> until after seeing the urologist.  Again just a
> precaution.

During Weed's deposition, #26, Ex. A. 80:1-5, regarding the
safety hand who took him to the emergency room in Williston after
Weed spotted blood in his urine, as well as a couple of months
earlier when he suffered abdominal pain while at work, Weed was
asked if it was company procedure to send somebody with an
employee when he went from work to see a doctor.  He responded
yes, and was asked, "Do you know why that was?"  Weed answered,
"Normally that's for the company knows what's going on with you."
Contrary to Hayes' comment when Weed reported blood in his urine,
these emails suggest that Sidewinder was keeping very close watch
on Weed and seeking very updated information about Weed's medical
diagnosis.

38:7-14; Ex. B-2 and Ex. C-2, Weed's doctor's note.  Weed returned
to work and gave the doctor's note to Hayes. *Id.*, Hayes Dep. 40:2-
11.   Sidewinder  followed  the  doctor's  instruction  and  assigned
another  worker  to  the  monkey  board,  but  Weed  continued  to  be
responsible  for  monitoring  the  valves  to  the  trip  tank  and  the
shakers,  Ex. A, Weed Dep., 95:10-16; Hayes Dep., #26, Ex. B, 25:7-
11.  After the spill and doctor's visit on February 16, 2013, Weed
continued  working  for  Sidewinder  on  February  17  and  18th,  as
evidenced by the drilling reports.  Hayes Dep. #26, Ex. b, 41:-
42:6.

    Sidewinder paid to fly Weed home to Colorado on February 19,
2013 to be checked out by his doctor.  #26, Ex. A, Weed Dep.,
134:12-14; Ex. C, Mitchell Affid. ¶5. The haste raises sufficient
questions  about  how  much  concern  Sidewinder  had  about  the
possibility that Weed had cancer.  According to Sidewinder, after
the  second  spill  and  after  Weed  returned  to  Colorado,  he  was
diagnosed with cancer.  Ex. A, Weed Dep., 134:17-25.

    Wendy  Mitchell  immediately  undertook  an  investigation  to
decide  if  Hayes'  recommendation  that  Weed  be  terminated  was
appropriate.   Ex.  C,  Mitchell  Affid.  at  paragraphs  1,7.   She
examined the write-up on the second spill and communications from
Hayes that StatOil did not want Weed working on its wells.  Hayes
is the only person to assert that Statoil did not want Weed on its
rig.   Weed  conceded  that  he  was  involved  in  the  first  mud  spill
and, regarding the second, according to Mitchell, Weed said that if

he had paid more attention to the trip tank, it would not have overflowed.  Ex. C, Mitchell Affid., ¶¶ 8, 10.  Mitchell then purportedly talked to Stephanie Schultz, Sidewinder's Human Resources Manager, and Travis Fitts, Sidewinder's Senior Vice President and Chief Administrative Officer of Operations, but the content of their conversations is not discussed.  *Id.*, at ¶11.  The Court notes that during Mitchell's "investigation," which began immediately after the February 18, 2012 spill, and nearly three months before Weed would have been employed for a year by Sidewinder, Mitchell asked Hayes to fill out a "Sidewinder Annual Appraisal Field Based Non-Supervisors."  The form for the appraisal was printed off by Hayes, who testified it in turn was filled out by Weed's immediate supervisor, Charles Johnson, was dated February 19, 2013 (#26, Ex. C-1 At ¶¶ 4-7 and Ex. C-1).  The signature on it is illegible.  Hayes was asked at his deposition whether he agreed with the low scores on the appraisal and whether Weed was a "subpar" employee; Hayes answered yes.  #26, Ex. B, Hayes Dep., 35:1-36:10.  Mitchell discharged Weed on February 27, 2013.

Sidewinder argues that Weed's ADA claim fails as a matter of law because Weed cannot prove a prima facie discrimination claim under the statute and because Sidewinder had a legitimate, nondiscriminatory reason to terminate him.  Weed cannot prove the third element of a prima facie case of discrimination, that Sidewinder discharged him "because" of his disability, because no one, including Weed, knew of his disability or regarded him as

disabled at the time of his termination.  Nor can Weed show that he was replaced by a non-disabled employee or treated less favorably than non-disabled employees under nearly the same circumstances (e.g., held the same job or responsibilities, shared the same supervisor, had employment status determined by the same person, and have comparable violation histories).  *Turner v. Kansas City Southern Railway Co.*, 675 F.3d 887, 893 (5th Cir. 2012).  The Fifth Circuit construes "very narrowly" the requirement that comparators be "similarly situated" as a "stringent standard."  *Montemayor v. Trump Healthcare*, No. H-11-2436, 2013 WL3229716, at *3 (S.D. Tex. June 25, 2013).

Sidewinder observes that Weed names Charles Johnson ("Johnson") and Shaun Coleman ("Coleman") as comparators, but emphasizes that Weed provides no evidence whether they are disabled.  Weed claims that Johnson is a comparator because on the same day that Weed allegedly caused his second mud spill, Johnson bent 90 feet of pipe, but was not terminated.  These are not comparable violation histories and they are not "similarly situated" employees, Sidewinder argues.  *See, e.g., Player v. Kansas City Southern Ry.*, 496 Fed. Appx. 479, 482 (5th Cir. Nov. 16, 2012)(comparing Player and two purported comparators).  Johnson and Weed are not comparators because they did not have similar job duties,[17] because bending pipe, which may have financial costs, is

---

[17] For Johnson's duties as a driller see Ex. B, Hayes Dep., 35:35-36:2; 47:15-24; 21:13-14; Ex. C, Mitchell Affid. ¶ 16

not similar to spilling oil-based mud, which creates safety and environmental hazards, and because Johnson was a competent employee and Weed was not.  Johnson was a driller and was Weed's immediate supervisor on February 18, 2013, when Weed was a derrickman, a position below in seniority to a driller.[18]

Nor was Coleman "similarly situated" to Weed, insists Sidewinder.  Coleman allegedly spilled oil-based mud in April 2013 and was not terminated, but he also failed to satisfy any of the Fifth Circuit's three requirements for a similarly situated employee.  First his job was lower level than Weed's.  When Weed's April spill occurred, Coleman was a Floorhand, an entry-level position with fewer responsibilities than a derrickman, who has more knowledge and experience than a Floorhand.  Ex. B, Hayes Dep., 45:21-25, 46:5-13; Ex. A, Weed Dep. 20:17-23.  Their duties are quite different:  a derrickman's duties include assisting the driller in drilling operations, working the monkey board, managing the mud system and equipment, and monitoring and repairing the monkey board and mud pumping system.  Ex. C, Mitchell Affid. at ¶17.  In contrast, a Floorhand is a general helper on the rig whose duties include working on the rig floor during tripping operations, performing maintenance and repairs on rig equipment as directed by

_____

For a derrickman's duties see Ex. c, Mitchell Affid. pars17

[18] As noted *supra*, under *LHC Group* and progeny, comparators and similarly situated employees are no longer required for disability discrimination in termination claims under the ADA.

the Driller, operating pipe handling equipment on the drilling location, and maintaining good housekeeping on the drilling site. *Id.* at ¶18.  Second, on the date Coleman purportedly caused a mud spill, the rig manager was Justin C. McKowan.  Ex. B, Hayes Dep., 46:14-47, 77:15-21.  At the time of Weed's February 18, 2013 spill, which led to his removal from the drilling rig, Steven Hayes was the rig manager.  "Comparators with different supervisors . . . generally will not be deemed similarly situated."  *Anderson v. Harrison County*, 639 Fed. Appx. 1010, 1014-15 (5th Cir. Feb. 12, 2016).  Third, regarding the fourth element of a prima facie case, that Coleman was an extremely proficient employee, unlike Weed, accounts for their different treatments by Sidewinder.  Ex. C, Mitchell Affid. ¶15.

Furthermore Sidewinder had a legitimate, nondiscriminatory reason for terminating Weed, i.e., poor performance.  Terminating an employee for what management believes is unsatisfactory performance is legitimate and nondiscriminatory as a matter of law. *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 701-02 (5th Cir. 2014). Sidewinder maintains that it terminated a poorly performing employee who only later happened to be diagnosed as having cancer. Sidewinder contends that Weed has not produced any evidence of pretext.

As for a retaliation claim under the ADA, to make a prima facie case the plaintiff must prove that (1) he participated in an activity protected under the statute, (2) his employer took an

adverse employment action against him, and (3) a causal connection exists between the protected activity and the adverse action. *Feist v. State of La., Dep't of Justice, Office of the Attorney General*, 730 F. 3d, 730 F.3d 450, 454 (5th Cir. 2013). Sidewinder asserts that requesting accommodations under the ADA may constitute a protected activity if the plaintiff has a good faith belief that he was disabled or perceived as disabled when the request was made. *See Tabatchnik*, 262 Fed. Appx. at 676-77 (upholding a summary judgment in an ADA retaliation claim: "Because Tabatchnik has not shown that he had a good faith belief that he was disabled or perceived as disabled, his request cannot be considered protected by the ADA."). Sidewinder argues that Weed's retaliation claim fails because at the time he requested an accommodation, he did not know he was disabled, so he could not have had a good faith belief that he was disabled or perceived as disabled by Sidewinder. Thus his request for an accommodation was not a protected activity under the ADA. *Tabatchnik*, 262 Fed. Appx. at 677.

Furthermore, insists Sidewinder, even if Weed could prove a prima facie case of retaliation, the burden shifts to Sidewinder to provide a nondiscriminatory reason for terminating Weed. Sidewinder had a legitimate nondiscriminatory reason for discharging Weed, i.e., that he was incompetent as evidenced by the two mud spills and other conduct. Weed cannot prove this reason was pretextual and that his doctor's note was the but-for cause of his termination.

**Weed's Response (#31)**

Supported by his own self-serving affidavit[19] (Ex. A to #31), Weed contradicts a number of Sidewinder's material assertions, Hayes' deposition, Mitchell's affidavit, and evidence and raises genuine issues of fact for trial.   When Magistrate Judge Stacy addressed Sidewinder's motion to strike Weed's affidavit (#32), she struck only five sentences, three noted below, as contrary to Weed's deposition testimony or as substantially misleading (#38). The rest of his affidavit was allowed into evidence.   The Court agrees with Judge Stacy that "[t]he statements in paragraphs 3,4,5,7, and 11 of Jason Weed's affidavit do not clearly, directly, and irreconcilably contradict his deposition testimony."   #38, p. n.1.

---

[19] A party's affidavit is often self-serving, but the Fifth Circuit does not exclude such an affidavit as incompetent for that reason by itself.   *C.R. Pittman Const. Co. v. National Fire Ins. Co. of Hartford*, 453 Fed. Appx. 439, 443 (5th Cir. Oct. 24, 2011)("[A]n affidavit based on personal knowledge and containing factual assertions suffices to create a fact issue even if the affidavit is arguably self-serving."), *citing inter alia Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003)("Provided that the evidence meets the usual requirements for evidence presented on summary judgment--including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial--a self-serving affidavit is an acceptable method for non-moving party to present evidence of disputed material facts."), and *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 2000)("[A] 'party's own affidavit, containing  relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.'"). A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary.

In paragraphs 3 and 4 of his affidavit, Weed avers,

3.  During my employment with Sidewinder, Mr. Hayes never counseled me, verbally or in writing.  Mr. Hayes never criticized my job performance for Sidewinder.  Mr. Pitts also never counseled me, verbally or in writing.  Mr. Pitts never criticized my job performance for Sidewinder. Likewise Mr. [Charles] Johnson [driller] never counseled me, verbally or in writing.  Mr. Johnson also never criticized my job performance for Sidewinder.  In fact, Mr. Johnson often praised my performance as a Derrickhand and said on at least one occasion that I knew the pit system better than anyone else.

4.  Further, I was never counseled or criticized for my work performance by any of my other Sidewinder superiors.

Weed raises key questions about the degree of seriousness and danger of the two spills and who was actually responsible for each of them.  Regarding the first issue, he attested, *id.* at paragraph 5,

5.  Sometime in November of 2012, as I was coming into my shift, there was a minor seepage of mud over the trip tank.  This is not a spill.  The mud barely spilled over on the side of the trip tank.  Below the tank is the trip tank container.  The seepage never even went into the trip tank container and thus the mud never came even close to the ground.  This minor seepage occurred because the flow line was running back into the trip tank and not into the shakers.  When I came on shift, I was told by the Derrickhand I was relieving that the valves were aligned back into the shakers.  This was incorrect and caused the minor seepage.  At the time, the Rig Manager was Billy Pitts.  Mr. Pitts did not counsel me and he did not say this was my fault.  Mr. Pitts only told me that sometimes you cannot trust the person you are relieving. Mr. Hayes was not on shift during this incident and he never talked to me about this incident.

Furthermore, Weed submitted an affidavit from Steven

Kussman ("Kussman"),[20] a crew member on the rig, testifying that he believed Shaun Coleman caused the spill by switching the valves on the flow line without alerting Weed to the change. Ex. F, Kussman Affidavit at ¶4. Like his co-workers, Kussman was never asked how the spill happened. *Id.*, ¶6; Ex. E, Mitchell Dep., 55:25-56:23. The spill was cleaned up in about thirty minutes. Ex. F, Kussman Affid. at ¶6. Furthermore Sidewinder did not register the spill in its Daily Drilling Report, nor complete an Environmental Incident report because the spill was not an environmental incident, nor did Sidewinder report it in its downtime report because it did not result in any employee or rig downtime. Ex. G, Fitts Dep., 35:11-36:14. Fitts, Sidewinder's corporate representative, Senior Vice President, and Chief Administrative Officer, also testified that the spill was not a breach of policy, nor did he consider it serious misconduct. *Id.* at 89:5-7.

Regarding the second spill, paragraphs 8-12 state,

8. On February 18, 2013, I was training Shaun Coleman, a floor hand, to run the pits. I later heard from others that Mr. Coleman switched the valves on the flow line without asking or telling me. I had previously told Mr. Coleman that he could not switch the valves on the flow line without my approval. By switching the valves on the flow line, Mr. Coleman caused about fifteen (15) barrels of invert mud to overflow.

---

[20] Although Sidewinder moved to have Kussman's affidavit stricken on the grounds that Kussman was not listed in Weed's Rule 26 disclosures (#32 at p.1), Magistrate Judge Stacy overruled the objection on the grounds that Weed's submissions "show that Steven Kussman was sufficiently disclosed during discovery-although his name was initially misspelled." #36 at ¶¶ 4 and 5.

9.  Most of the overflowed invert mud went into the catch pan around the trip tank and a minimal amount went onto the matting boards.  No invert mud went onto the ground and no spill was reported. . . .[21]

10.   The spill was quickly cleaned up without any interruption to the drilling operations.  Around this time, Mr. Johnson bent some drilling pipe.  This caused the rig to stop operating for between an hour or two.

11.  After we cleaned up the spill, Mr. Hayes, without asking me what happened, fired me.  He said simply, "I'm firing you."  I believed that as the Rig Manager, Mr. Hayes had the authority to fire me.

12.  I never saw or heard Mr. Hayes ask any of the other members of the crew how the spill occurred or who was responsible for the spill.  I thought this was odd since at the time of the spill Mr. Hayes was in his office and he could not have seen or heard how the spill occurred.

Weed also submits an email written by Hayes to Wendy Mitchell (Ex. D), in which Weed says that Hayes lied in stating that he verbally counseled Weed regarding the November 2012 incident because Hayes admitted during his deposition that he was not there at the time.  Ex. C, Hayes Dep., 59:18-61:8.  Indeed, Hayes could not answer basic questions about the event.  Ex. C, Hayes Dep. 53:4-20.  During his deposition Hayes conceded that it was fair to say about the November 2012 event that he did not know "if it was Hayes' fault or someone else's fault."  *Id.* at 56:4-20.  Weed further insists that Hayes never counseled him or any of his

---

[21] Judge Stacy struck the last three sentences as contrary to Weed's deposition or substantially misleading:

In fact, Statoil representative, Conrad Peterson, told me that everything was okay.  Mr. Peterson said to clean up the spill and that it would not be reported.  Mr. Peterson was calm and did not appear upset.

supervisors while he was employed with Sidewinder, and neither Hayes nor Defendant produced any written, corroborative evidence that Weed was ever counseled or disciplined prior to being diagnosed with cancer.

Sidewinder claims that Mitchell performed an independent investigation of what led up to Weed's termination, but Weed argues that Mitchell relied solely on what Hayes told her or provided to her and that the investigation was anything but independent and adequate.  She did not talk to or get statements from Rig Manager Pitts, nor any managers or supervisors, did not review any of the numerous reports used by Sidewinder to document serious issues, nor talk with or receive statements from any of the crew members or Statoil representatives.  Ex. E, Mitchell Dep. 51:10-52:11, 53:4-54:23, 51:21-52:11; 55:25-56:11, 52:12-17, 56:19-57:1.  Mitchell did review a write-up about the February 18th spill, but that write-up was written by Hayes.  She reviewed an evaluation of Weed after he was discharged that Hayes contended was written by Charles Johnson, but Mitchell never talked to Johnson or got a statement from him to confirm or deny that he wrote it.  In essence, argues Weed, even if Mitchell made the ultimate decision to fire Weed, she merely "rubber-stamped" Hayes' recommendation without performing an independent investigation.  If an independent investigation relies on facts provided by a biased supervisor, the employer (either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation

to the biased supervisor. *Staub v. Proctor Hospital*, 562 U.S, 411, 421 (2011). The degree to which the final decisionmaker's decisions were based on his or her own independent investigation is a question of fact. *Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir. 1996).

Weed asserts that there is no dispute the Sidewinder knew on February 16, 2013, two days before he was sent home, that Weed might have cancer. As discussed, Josh Ransonet sent Hayes two emails that day updating him on Weed's doctor visit, one as late as 11:06 p.m. Weed also told Hayes that the doctors said Weed might have cancer. Ex. A, Weed Affid. at paragraphs 3-4. The safety hand that accompanied Weed to the hospital also told Hayes that the doctor said Plaintiff's cyst had the possibility of being cancerous. Ex. K, February 16, 2013 E-mail from Josh Ransonet labeled SIDEWINDER 20. The ADA's definition of "disability" allows suits by plaintiffs who, although not actually disabled under § 12102(2)(A), are nonetheless "regarded by the employer as having such impairment." 42 U.S.C. § 12102(2)(C):

> One is regarded as having a substantially limiting impairment if the individual (1) has an impairment which is not substantially limiting but which an employer perceives as constituting a substantially limiting impairment; (2) has an impairment which is substantially limiting only because of the attitudes of others toward such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment.

*Bridges v. City of Bossier*, 92 F.3d 329, 332 (5th Cir. 1996).

To the degree that Sidewinder argues that Weed was not

disabled because there was not a 100% confirmation that he had cancer, Weed points to Hayes' comments which Weed claims show that he regarded Weed as having a substantially limiting impairment. Weed reported that when he returned from the doctor with an order that he be put on light duty, Hayes was upset and not happy; Hayes asked Weed "what good are you doing out here.  You won't be doing anything.  You will have to train somebody." Ex. A, Weed Affid. at ¶7.  Furthermore, Weed points to the temporal proximity of only two days between Sidewinder's knowledge of his potential disability and his being sent home for further medical evaluation, which confirmed he had cancer, and was quickly fired by Mitchell on the 27th of February, as sufficient evidence of causality to establish a prima facie case.  *Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'").  Meanwhile Hayes had been urging the quick dismissal of Weed since the February spill, the significance of which he has questioned.

As for his retaliation claim,[22] Weed argues that a plaintiff

_____

[22] To state a prima facie claim of retaliation under the ADA the plaintiff must show that (1) she engaged in an activity protected by the ADA, (2) she was subjected to an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action.  *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999).

-44-

does not need to show that he suffers from an actual disability; rather, a reasonable good faith belief by the plaintiff that the statute has been violated is sufficient.  *Tabatchnik*, 262 Fed. Appx. 671 & n.1.  A request for accommodation, such as Weed's (and his doctor's) for light duty on the ground, qualifies as a protected activity for purposes of a retaliation claim.  *Jenkins v. Cieco Power, LLC*, 487 F.3d 308, 317 n.3 (5th Cir. 2007).

Furthermore, Weed notes, the Court examines three factors in evaluating the causal link element of a retaliation claim:  "(1) the extent of the employee's past disciplinary record; (2) whether the employer followed its policies and procedures in dismissing the employee; and (3) the temporal relationship between the employee's conduct and his termination."  *Nowlin v. Resolution Trust Co.*, 33 F.3d 498, 508 (5th Cir. 1994).

Sidewinder challenges only the first element and, without supporting evidence, claims that Weed's retaliation claim fails because he did not know he was disabled.  Weed has previously described why he thought he might have cancer and how others may well have perceived him as having cancer.

Weed may show the employer's reason for his discharge is pretextual by evidence of disparate treatment or demonstrating that the employer's proffered reason is false or unworthy of credence. *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).  Here Sidewinder seems to claim that Weed was a bad employee and caused two mud spills.  There is no objective evidence to support such a

claim.   Weed has shown that Hayes during his deposition admitted he did not know who caused the November 2012 spill.   Thus Hayes' claim that he discharged Weed from Rig 301 for causing the first spill is false.   Regarding the second spill, Weed produced Kussman's affidavit indicating Kussman's belief that Coleman caused that spill.   Sidewinder produces no evidence of anyone who was on the rig at the time of the spill to explain how the accident occurred and who was responsible, but instead relies on Hayes, who was in his office and not on the rig at the time.   In addition evidence undermines the credibility of Hayes' proffered justification.

Weed points out that Sidewinder has a written progressive disciplinary policy that first begins with oral counseling, then requires written counseling, followed by suspension, and finally termination.   Ex. H, Feb. 8, 2013 Performance Counseling/ Disciplinary Process labeled SIDEWINDER-53-54.   Even if the first spill was Weed's fault, it would have been his first disciplinary issue and should have resulted in only a written warning.   When an employer has a disciplinary system that involves warnings, failure to follow that system gives rise to inferences of pretext.  *Goudeau v. National Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015), *citing Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354 n.29 (5th Cir. 2005)(Even if the policy is not mandatory and the plaintiff is an at-will employee, "these facts do not eliminate the inference of pretext raised by its failure to follow an internal policy specifically stating that it should be 'followed in most

circumstances.'"); *Feist*, 730 F.3d at 454-55 (relevant evidence for establishing a prima facie retaliation case "may include an employment record that does not support dismissal, or an employer's departure from typical policies and procedures.").

Weed maintains that three other incidents involving three other employees are more serious than the February 18 spill, but for which those employees received no or only minor discipline.  On February 18, 2013 Driller Johnson bent some drilling pipe, resulting in downtime for the rig of two hours, during which the rig was not operational and lost about $1,500 to $2,000.  Ex. C, Hayes Dep., 85:22-24; 86: 86:2-3; 86:4-11, and 85:3-7.  For this matter Johnson received a written counseling.  Ex. C,85:3-7.  Two months later Coleman spilled 140 barrels of invert mud, with twenty barrels spilled on the ground.  For this spill Sidewinder had to complete an Environmental Incident report and Statoil had to hire a vacuum truck to pick it up.  Weed does not know if Coleman was disciplined.  On November 7, 2012 a Derrickhand named Jesse Jaros caused twenty barrels of invert mud to spill, another incident that required Sidewinder to complete an Environmental Incident report because five of the barrels spilled on the ground. Ex. F, Kussman Affid. ¶7; Exhibit I, April 23, 2013 Environmental Incident labeled SIDEWINDER-139; Ex. G, Fitts Dep. 36:19-37:10, 55:1-7.  Again there is no indication whether Jaros was disciplined.  Though the February 18 spill attributed to Weed was the least serious in caparison with the other three, it was the only incident that led

to someone's termination.   It was not an Environmental Incident because no mud went into the ground, the spill was not logged on the Drilling Report, the spill did not cause any downtime, and it did not result in any economic loss, argues Weed.

The Court points to Sidewinder's policy, "Performance Monitoring/Performance Counseling/Disciplinary Process" (#33, Ex. H), which states in relevant parts,

**OBJECTIVE**
It is the objective of this policy to provide a defined process regarding counseling and disciplinary actions that facilitate the achievement of the Company's business objectives and is consistently fair and equitable for all personnel.

**SCOPE**
This policy applies to all Sidewinder Drilling personnel (domestic and expatriate), unless compliance would violate local law or regulation.

**EXPECTATIONS**
1.   Under normal circumstances, Sidewinder endorses a policy of progressive counseling and discipline in which it attempts to provide employees with notice of deficiencies and an opportunity to improve.  It does, however, retain the right to administer discipline in any manner it sees fit.  This policy does not modify the status of employees-at-will or in any way restrict Sidewinder's right to bypass the disciplinary procedures suggested.

2.   The normal application of progressive counseling and discipline will be:

2.1   If an employee is not meeting the Company Standards of performance, the employee's supervisor will take the following action:

2.1.1.  Meet with the employee to discuss the matter.

2.1.2  Inform the employee of the nature of the problem and the action necessary

to correct it; and

2.1.3.   Prepare a note for the supervisor's own records indicating that the meeting has taken place.

2.2.   If there is a second occurrence, the supervisor is to hold another meeting with the employee and take the following action:

2.2.1.   Issue a written warning to the employee; . . .

2.2.2. Warn the employee that a third incident will result in more severe disciplinary action; and

2.2.3.   Prepare and forward to the Department Head or Area Manager (as applicable) the written warning describing the first and second incidents and a summary of the action taken/agreed during the meeting with the employee.

2.3.  If there are additional occurrences, the Department Head or Area Manager (as applicable) should take the following action, depending on the severity of the conduct:

2.3.1   Issue a written reprimand or warning; . . .

2.3.2.   Suspend the employee (with or without pay) for up to five working days; or

2.3.3.   Suspend the employee indefinitely (with or without pay) and recommend termination.

2.4   After taking action under Expectation 2.3.3, above, the Department Head or Area Manager (as applicable) should prepare and forward to the Human Resources Department another written report describing the occurrences, and summarizing the action taken or recommended and its justification. . . .

4.   In cases involving serious misconduct, or at any time the supervisor determines it is necessary-

–such as a major breach of policy or violation of law, the procedures contained in Expectation 2.3 above may be disregarded.  Typically the Department Head or Area Manager (as applicable) may suspend the employee (with or without pay) and an investigation of the incidents lading up to the suspension conducted to determine if any further action, such as termination, should be taken.

5.  The Department Head or Area Manager (as applicable) will send recommendations for termination to the Human Resources Department for review.  ***This information must be accompanied by any needed supporting documents, such as performance appraisals, warning letters, or disciplinary reports.*** (Emphasis added by the Court.)

While it is clear from the language that Sidewinder's progressive policy is not mandatory in all cases, questions still arise why it was not applied in Weed's case.  There is no explanation why it was not.  Moreover, the complete absence of any written disciplinary record in his case to corroborate the deposition and affidavit testimony of Hayes and Mitchell, which is contrary to the testimony of Weed, is again without explanation and highly suspicious, especially since Weed has raised issues about the seriousness of the mud spills attributed to him and why they were attributed to him, as opposed to the mishaps of other workers who were not terminated.  Moreover the complete absence of corroborating written documents also means that step 5 has not and cannot be met.  These differences are underlined by Sidewinders' failure to complete an Environmental Incident Report in light of Sidewinder's insistence on the danger of the two mud spills attributed to Weed, since such reports were issued following

accidents by others named by Weed.  Another example, while Mitchell claims that she spoke to Weed a few days after the second spill attributed to him and that Weed supposedly admitted he caused it, Mitchell has no objective or corroborative evidence to support her claim.

Indeed the absence of objective and/or corroborating evidence results in conflicting deposition and affidavit testimony creating disputed issues of material fact here.

### Sidewinder's Reply (#33)

Because Judge Stacy's ruling (#38) on Sidewinder's motion to strike Weed's affidavit (#32) stands, the Court does not address Sidewinder's arguments that Weed's affidavit is a "sham" or "work of fiction" that misrepresents evidence or distracts with red herrings and that he has changed his story three times.

Sidewinder argues that disputing an employer's assessment of an employee's performance does not create a fact issue. *LeMaire v. Louisiana Dept. of Transp. and Development*, 480 F.3d 383, 391 (5th Cir. 2007)("Our job as a reviewing court conducting a pretext analysis is not to engage in second-guessing of an employer's business decision.  Our anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory ones. [citations omitted]"; *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2007)("The issue at th pretext stage is whether Appellee's reason, even if incorrect, was the real reason for Appellant's termination.  Thus, Appellant must adduce evidence

supporting an inference that Appellee's motive was age-based animus or at least, that Appellee's explanation if its motive is false. [citations omitted]"). Weed must present evidence that would allow a reasonable jury to find that Sidewinder did not actually believe Weed's performance was deficient and did not believe that he caused the spills. He has failed to do so. Attacking the adequacy of Sidewinders' investigation is insufficient to create a fact issue regarding Sidewinder's reason for terminating him. *Arey v. Watkins*, 385 Fed. Appx. 401, 403-04 (5th Cir. July 14, 2010)(Under the third step of the *McDonnell Douglas* burden-shifting framework for discrimination claims under Title VII and § 1981, where the evidence is circumstantial, the plaintiff has "the burden of producing evidence that would allow a reasonable jury to find that [the employer's] proffered reasons were pretexts for discrimination"; "'even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason' for termination. . . .'" "'[A] dispute in the evidence concerning . . . job performance does not provide a sufficient basis for a reasonable factfinder to infer that [a] proffered justification is unworthy of credence."); *Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 746 (S.D. Tex. 2014)([T]he real issue is 'whether [the employer's] *perception* of [the employee's] performance, accurate or not, was the real reason for [his or] her termination."). Sidewinder argues that it does not matter whether Weed caused the mud spills, an immaterial issue because Weed has

not presented any evidence that Sidewinder did not believe its stated reasons for terminating him.[23]

As for Weed's retaliation claim under the ADA, Sidewinder argues that Weed failed to show a conflict in substantial evidence regarding whether the protected activity was the "but for cause of his termination. *Feist*, 730 F.3d at 454. He also failed to respond to Sidewinder's argument that Weed did not have a good faith belief he was disabled when he requested light duty.

### Court's Decision

The ADAAA governs here because the actions complained of occurred after the ADAAa's effective date of January 1, 2009. An individual satisfies the requirement of "being regarded as having such an impairment" if he demonstrates that he has been subjected to a prohibited action because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). The amendment was designed to make it easier "to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4).

The Court finds that Weed has raised a genuine issue of material fact as to whether he qualifies as "disabled" under the "perceived as disabled" prong of the definition of "disabled" in the ADA and the ADAAA. Weed went to doctors, first suffering from

---

[23] Showing the employer's failure to follow its standard practice of discipline without any explanation, however, does raise fact issues about Sidewinder's "legitimate nondiscriminatory reason" as pretext for Weed's termination.

abdominal pain in November 2012 and, less than three months later,
from blood in his urine, resulting in his doctor's concern to have
followup testing to determine if Weed might have cancer and in
imposing the restrictions that Weed work only on the ground at
Sidewinder.  That these facts were immediately conveyed the same
day of his doctor's visit to Sidewinder by emails from Joshua
Ransonet, one as late as 11:06 p.m. at night, that Sidewinder acted
quickly to send Weed home within two days for an evaluation by his
own doctor, resulting in a diagnosis of cancer, and that Hayes
immediately pressed Mitchell for Weed's termination from
Sidewinder, which occurred on February 27, 2013, raise substantial
questions of disability discrimination.   In addition Sidewinder
began an investigation on the second spill immediately after it
occurred on February 16, 2016, even though the spill apparently was
not viewed as significant enough to warrant Sidewinder's preparing
an Environmental Incident Report nor mentioning it in the Daily
Drilling reports.  That before Weed went home Weed returned to work
at Sidewinder for two days with the ground restriction and was able
to perform his job raises a genuine issue of material fact that he
was qualified for his job with or without accommodation, but
suffered termination because he was perceived as suffering from
cancer.  Furthermore, even though Weed was not due for his first
annual evaluation for several months, Mitchell arranged for one
immediately; then Hayes printed up the form and  purportedly gave
it to Weed's immediate supervisor, Charles Johnson, who filled it

with negative evaluations, with Hayes' concurrence, on February 19, 2013.  The signature on the signature line is completely illegible. In addition to this extreme haste, the complete lack of any written disciplinary record for Weed other than Mitchell's email regarding her hasty and Mitchell's cursory investigation of the February 16, 2013 spill, and the circumstances of Weed's termination sharply divergent from Sidewinder's progressive discipline policy, raise genuine issues of material fact about the actual reason(s) for his dismissal.  Viewed in a light most favorable to Weed, all these circumstances together give rise to a reasonable inference that Sidewinder acted to cover up its actual reason for terminating Weed.  Weed has raised a genuine issue whether all these circumstances combined in this scenario are sufficient to trigger protection for him as an employee "perceived" to be disabled under the ADAAA and treated as if he had such a disability, and whether Sidewinder's explanation for his termination ("subpar" employee) was pretextual.  As noted, under the ADAAA, cancer, even when in remission, is a "disability" that substantially limits the major life activity of "normal cell growth."  42 U.S.C. § 12102(4)(D)(expressly stating, "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.").  *See Cutrera v. Board of Supervisors of Louisiana State University*, 429 F.3d 108, 112 (5th Cir. 2005)(recognizing that a plaintiff's own description of the symptoms he suffers is sufficient to raise a genuine issue of

material fact for trial as to whether he is disabled within the meaning of the ADA), *cited by Carbaugh v. Unisoft Intern., Inc.*, Civ. A. No. H-10-0670, 2011 WL 5553724, at *8 (S.D. Tex. Nov. 15, 2011).

Accordingly, for the reasons stated above, the Court

ORDERS that Weed's claim for failure to accommodate under the ADA is DISMISSED with prejudice.  The Court further

ORDERS that Sidewinder's motion for summary judgment (#24) is DENIED.

SIGNED at Houston, Texas, this  29th  day of  March , 2017.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE